UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

In re:

PACIFIC ANDES RESOURCES DEVELOPMENT
LIMITED,

                                        Debtor.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

:
:
:
:
:
:
:
:
:

Chapter 11

**Case No. 16-12739 (JLG)**

## DECLARATION OF NG PUAY YEE PURSUANT TO
## RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR
## THE SOUTHERN DISTRICT OF NEW YORK AND IN SUPPORT
## OF DEBTOR'S FIRST DAY MOTIONS AND APPLICATIONS

I, **NG PUAY YEE ANNIE (JESSIE)**, hereby declare as follows:

1.      I am the Executive Chairman of Pacific Andes Resources Development Limited (the "**Debtor**").

2.      On September 29, 2016 (the "**Commencement Date**"), the Debtor filed a petition under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). In addition to the Debtor's filing in this case, certain affiliates[1] of the Debtor, including the Debtor's indirect parent Company PAIH, filed petitions under Chapter 11 of the Bankruptcy Code on June 30, 2016, and certain affiliates of the Debtor filed Chapter 15 proceedings on June 30, 2016[2], in furtherance of the global reorganization efforts undertaken by the Pacific

---

[1]      Pacific Andes International Holdings Limited (Bermuda)("**PAIH**") - Case No. 16-11890; China Fishery Group Limited (Cayman) – Case No. 16-11895; China Fisheries International Limited (Samoa) – Case No. 16-11896; N.S. Hong Investments (BVI) Limited – Case No. 16-11899; Super Investment Limited (Cayman) – Case No. 16-11903; Smart Group Limited (Cayman) – Case No. 16-11910; CFG Peru Investments Pte. Ltd. (Singapore) – Case No. 16-11914; CFGL (Singapore) Private Limited – Case No. 16-11915; Fortress Agents Limited (BVI) – Case No. 16-11916; Ocean Expert International Limited (BVI) – Case No. 16-11917; Growing Management Limited (BVI) – Case No. 16-11919; Target Shipping Limited (Hong Kong) – Case No. 16-11920; Chanery Investment Inc. (BVI) – Case No. 16-11921; Champion Maritime Ltd. (BVI) – Case No. 16-11922; Protein Trading Limited (Samoa) – Case No. 16-119223; South Pacific Shipping Agency Ltd. (BVI) – Case No. 16-11924 (Jointly Administered under Case No. 16-11895)(collectively as "**Affiliated Debtors**").

[2]      CFG Investment S.A.C. – Case No. 16 – 11891(JLG); Corporacion Pesquera Inca S.A.C. – Case No. 16-11892(JLG); Sustainable Fishing Resources, S.A.C. – Case No. 16- 11894(JLG) ("**Affiliated Chapter 15 Debtors**").

1

Andes group of companies (the "**Pacific Andes Group**"), which includes the Debtor. The cases involving the Affiliated Debtors are currently jointly administered under Case No. 16-11895 (JLG) (the "**Affiliated Chapter 11 Cases**").

3.    I submit this Declaration on behalf of the Debtor pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York (the "**Local Rules**") for the purpose of apprising the Court and parties-in-interest of the circumstances that compelled the commencement of this chapter 11 case on the Commencement Date and in support of (i) the Debtor's chapter 11 petition (the "**Petition**") and (ii) the motions and applications that the Debtor has filed with the Court, including, but not limited to, the "first-day motions" (the "**First Day Motions**").

4.    I refer to and incorporate by reference herein my Declaration submitted on June 30, 2016 pursuant to Rule 1007-2 of the Local Rules in support of the Debtor's affiliates' first day motions and applications in the Affiliated Chapter 11 Cases (Case No. 16-11895) (JLG) (the "**June 30 First Day Declaration**"). In particular, I refer to paragraphs 4 to 13 of the June 30 First Day Declaration that sets out my credentials and involvement with the Pacific Andes Group.

5.    I was appointed as Executive Chairman of the Debtor on December 15, 2015. I was appointed in response to a specific request made by certain lenders of the Pacific Andes Group that the former Executive Chairman of the Pacific Andes Group that includes the Debtor, Ng Joo Siang (who is my brother), be replaced. In my current role, I am primarily responsible for interfacing with creditors, and other stakeholders, of the Pacific Andes Group in the context of their ongoing reorganization efforts.

6.    In my role as Executive Chairman of the Debtor (and of the Pacific Andes Group), and with considerable assistance of the Debtor's employees and advisors, I have

2

been extensively involved in the Affiliated Chapter 11 Cases and the Chapter 11 Case of the Debtor. Prior to the filing by the Debtor of its petition under Chapter 11 of the Bankruptcy Code on the Commencement Date, I was also extensively involved in the Debtor's reorganization efforts that were previously initiated under the supervision of the High Court of the Republic of Singapore (the "**Singapore Court**"), which were commenced on June 30, 2016 (being July 1, 2016 Singapore time).[3]

7.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the operation of the Debtor, the Pacific Andes Group, and the fishing industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.   Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis for the Pacific Andes Group, which includes certain non-debtor entities.

## I.      OVERVIEW OF THE DEBTOR AND ITS BUSINESS AND THE REASONS FOR THE CHAPTER 11 CASE

### A.  Overview of Reasons for the Chapter 11 Case

8.      The Debtor is both an investment holding company within the Pacific Andes Group and has also historically been principally engaged in global sourcing, transportation, logistics and supply of frozen seafood products to the international markets, in particular to the People's Republic of China ("**China**"). The Debtor, directly and through certain of its subsidiaries, has historically been one of the leading suppliers of frozen seafood to China. The Debtor, through its subsidiaries, is also engaged in the marine transportation and logistics

---

[3]        On September 29, 2016, the Debtor submitted an affidavit notifying the Singapore Court of its decision to withdraw from the Singapore Proceedings, which withdrawal and dismissal is awaiting mere procedural effect as of the date hereof.

business through the deployment of vessels that provide other fishing vessels with marine fuel, food and other basic provisions. Given the recent financial difficulties faced by the Pacific Andes Group, including the Debtor, the Debtor's marine transportation and logistics business has substantially shrunk, primarily due to its inability to obtain working capital which is a crucial component of these businesses.

9.      Currently, the Debtor's most substantial asset is its indirect equity interest in the China Fishery Group (defined below herein). The China Fishery Group is the industrial arm of the Pacific Andes Group that holds the largest quota for the harvesting of anchovy in Peru. The China Fishery Group is one of the largest producers of fishmeal and fish oil in the world, annually producing approximately 300,000 metric tons of fishmeal and 50,000 metric tons of fish oil which, in a normalized year, generates approximately $580 million in revenue and between $185 million to $200 million in EBTIDA.

10.      The value of the Pacific Andes Group has been put in jeopardy as a result of (a) certain aggressive and improper acts taken by certain lenders and (b) natural events (El Niño) that together have triggered a liquidity crisis. As a result of the reorganization efforts that were commenced on June 30, 2016, a sale process that the Pacific Andes Group commenced pre-petition has not progressed in accordance with the expectations of a small group of lenders. Instead of engaging with the Pacific Andes Group in restructuring discussions, these lenders have undertaken hostile and aggressive actions by embarking on a multi-jurisdictional litigation strategy in the various jurisdictions in which the Pacific Andes Group has sought to progress and implement its global reorganization efforts.

11.      Due to the corporate structure of the Pacific Andes Group, enforcement efforts by one lender or a small group of lenders at any level of the Pacific Andes Group would potentially enable that lender (or those lenders) to displace management and indirectly

4

control the China Fishery Group. Indeed, certain lenders have openly disclosed and conveyed that their overriding intention in attempting to take control over the Debtor is to gain control of the China Fishery Group with a view to an immediate sale of the Peruvian fishmeal business of the Pacific Andes Group.

12.      In light of the single-minded objective of certain of its lenders, the Pacific Andes Group was compelled to undertake global reorganization efforts on June 30, 2016, including the filing of the Affiliated Chapter 11 Cases before this Court and the prior proceeding before the Singapore Court, in order to protect and preserve value for all stakeholders of the Pacific Andes Group.

### B.   The Debtor's initial reorganization efforts in Singapore

13.      In connection with the global reorganization efforts of the Pacific Andes Group, on June 30, 2016, the Debtor filed a petition under Section 210 (10) of the Companies Act of the Republic of Singapore (the "**Singapore Companies Act**") seeking relief (a stay) against all enforcement actions against the Debtor, with a view to implementing its restructuring or reorganization through a Singapore scheme of arrangement in due course. Of course, given the vertical nature of the corporate structure of the Pacific Andes Group and the value of the China Fishery Group's Peruvian fishmeal business, the restructuring of the Debtor in Singapore was necessarily contingent upon the reorganization of the China Fishery Group in Peru and the United States, without which, it would be very difficult to formulate a viable restructuring plan with respect to the Debtor. I explain the rationale for the Debtor's reorganization efforts in Singapore and the reasons for the commencement of this Chapter 11 case at paragraphs 50 to 55 of this Declaration.

C. **History and Business of the Pacific Andes Group and the Debtor**

14.     I refer to paragraphs 29 to 54 of the June 30 First Day Declaration which set out the history, background and businesses of the Pacific Andes Group. The Debtor is an intermediate investment holding company within the Pacific Andes Group. The Debtor is an indirect parent company of the China Fishery group of companies (the "**China Fishery Group**") which, as discussed herein, is a very significant element of the Pacific Andes Group. The Debtor is also an indirect subsidiary of PAIH.

15.     The Debtor was listed on the mainboard of the Singapore Exchange Securities Trading Limited (the "**Singapore Stock Exchange**") in 1996 under the ticker P11.SI.

16.     The Debtor has historically, through certain of its subsidiaries, sourced a large volume of whitefish, such as Alaska Pollock and Cod, from international suppliers, particularly fishing companies operating in the North and South Pacific oceans, and distributed frozen products through its extensive distribution networks internationally, in particular, in China. The frozen fish business of the Debtor has historically been operated through reefer vessels, which are fully equipped with refrigerating facilities to ensure that fish will be kept frozen during transportation. Where direct high sea transhipment of frozen fish was capable of being be carried out, vessels were sent out to the fishing grounds to collect the catch directly from suppliers' trawlers. Frozen seafood products that were collected from these trawlers were then transported in the reefer vessels to markets in China, South Korea, Africa, Europe and North America where they were sold directly to import/export companies or stored in bonded warehouses for further distribution to the Debtor's customers. The frozen fish supply chain management business is capital intensive and requires extensive amounts of working capital and trade finance.

17.    Whitefish is primarily sourced from Russian fishing companies, which load their catches directly onto reefer transportation vessels at sea, chartered by the PARD and its subsidiaries [4], excluding Richtown Development Limited (the "**PARD Group**"). This approach allowed the suppliers to further extend their time at sea, while providing the PARD Group with a stable supply of whitefish at attractive prices.

18.    Generally, the PARD Group entered into single-season supply contracts with its suppliers prior to the commencement of each fishing season. Under the terms of the supply contracts, the PARD Group was generally required to make prepayments to its suppliers. I understand it was necessary for these prepayments to be made in order to enable the fishing companies to prepare for the fishing season, without which they would not be willing and/or able to supply the PARD Group with fish. As part of those fish supply and purchase arrangements, I understand that the PARD Group entered into arrangements with the fish suppliers which set out pre-agreed quantities of fish that the PARD Group would purchase from these fish suppliers and importantly, the price at which the fish would be purchased.

19.    Unfortunately, the financial difficulties faced by the Debtor and certain other companies of the Pacific Andes Group have deprived the Debtor of working capital required to make the necessary prepayments to the fishing companies to fulfil its obligations in relation thereto.   At present, the frozen fish and supply chain management business is currently inactive (as explained in detail below).

20.    Currently, the Debtor still operates a small transportation business through certain of its subsidiaries, under which it enables other fishing vessels to operate continuously

---

[4]        Pacific Andes Enterprises (BVI) Limited, Parkmond Group Limited and Pacific Andes Food (Hong Kong) Company Limited.

at sea by chartering transport vessels for delivery and supply of marine fuel and other basic necessities and supplies to these fishing vessels.

## II.    CORPORATE STRUCTURE

### A.  Incorporation History

21.    The Debtor was incorporated as an exempted company under the laws of Bermuda on June 27, 1996. In 2006, the Debtor was listed on the Singapore Stock Exchange.

### B.  Financial Performance and Cash Position

22.    As of March 28, 2014, the Pacific Andes Group, on a consolidated and unaudited basis, held approximately $4,669 million in assets and $2,515 million in liabilities.

23.    For the fiscal year ending on September 28, 2014, the Pacific Andes Group, on a consolidated annual audited basis, reported revenues of approximately $1,616 million.

24.    For the fiscal year ending on September 28, 2014, the Debtor, on a consolidated annual audited basis, reported revenues of approximately $1,042 million and operating income of approximately $162 million, of which $379 million of revenues are attributable to the frozen fish and supply chain management operation and $37 million of revenues are attributable to its transportation business.  These business segments have now substantially ceased operations or are greatly reduced due to lack of working capital.  The remainder of the revenue is attributable to the China Fishery Group's revenue.

25.    The most valuable asset of the Debtor is its investment in the China Fishery Group[5] held through its interest in Richtown Development Limited, which is an indirect majority shareholder in China Fishery Group Limited.

---

[5]    The Debtor is an indirect approximately 57% shareholder of the China Fishery Group Limited.

26.     The most valuable asset owned by the China Fishery Group is its Peruvian fishmeal and fish oil operation held through its interests in CFG Investment S.A.C. and Corporacion Pesquera Inca S.A.C.

27.     As of the Commencement Date, the Debtor has approximately $256,043.99 of cash on hand, including $191,461.62 on account with Klestadt, Winters, Jureller, Southard & Stevens, LLP in New York (in the form of a retainer).

28.     The reporting currency of the Debtor is Hong Kong Dollars.  While the Pacific Andes Group transacts business largely in United States Dollars, the Debtor also conducts business worldwide in various currencies including but not limited to: Chinese Renminbi, Euros, Namibian Dollars, Norwegian Krones and Singapore Dollars.

### C. Debtor's Pre-petition Indebtedness

The following describes the Debtor's major indebtedness:

29.     **Singapore Dollar Bonds.**   S$200,000,000 (approximately $149,000,000) 8.50% unsecured and unguaranteed bonds issued by the Debtor pursuant to a trust deed dated July 30, 2014 (the "**Trust Deed**") between the Debtor (as issuer) and The Hongkong and Shanghai Banking Corporation Limited ("**HSBC**") as trustee. The Trust Deed is governed by English law. Since January 2016, the Debtor has been engaged in discussions with an informal steering committee of SGD Bondholders owning approximately 5.5% of the SGD Bonds since January 2016 and, as of September 2016, the informal steering committee represented the interests of bondholders holding 26.2% of the total value of the SGD Bonds. The Debtor is also in regular contact and discussions with another 102 SGD Bondholders.

30.     **Rabobank Working Capital Facilities.** Banking facilities of approximately $22,000,000 in outstanding principal amount (the "**Rabobank Working Capital Facilities**")

9

were made available by Rabobank International, Hong Kong Branch ("**Rabobank**"),
pursuant to a facility letter dated August 30, 2013. The borrowers under the Rabobank
Working Capital Facilities are Pacific Andes Enterprises (BVI) Limited ("**PAEBVI**"),
Parkmond Group Limited ("**Parkmond**") and Europaco Limited, each an indirect subsidiary
of the Debtor, and the Debtor is a guarantor in respect of the obligations of PAEBVI and
Parkmond under the Rabobank Working Capital Facilities.

31.    **Maybank Facilities.**    Banking facilities of approximately $63,000,000 in
outstanding principal amount (the "**Maybank Facilities**") were made available by Malayan
Banking Berhad ("**Maybank**") pursuant to a facility letter dated August 21, 2014. The
borrowers under the Maybank Facilities are PAEBVI and Parkmond, and the Debtor is a
guarantor in respect of the Maybank Facilities.

32.    **CITIC Banking Facilities.** Banking facilities of approximately $59,000,000
in outstanding principal amount (the "**CITIC Banking Facilities**") were made available by
China CITIC International Bank pursuant to a facility letter dated December 9, 2013, as
amended and supplemented by a supplemental facility letter dated March 20, 2014. The
borrowers under the CITIC Banking Facilities include, among others, PAEBVI and
Parkmond, and the Debtor is a guarantor in respect of the obligations of PAEBVI and
Parkmond under the CITIC Banking Facilities.

33.    **Bank of America Working Capital Facilities.** Banking facilities of
approximately $15,000,000 in outstanding principal amount (the "**Bank of America
Working Capital Facilities**") were made available by Bank of America, N.A., ("**BOA**")
pursuant to a facility letter dated August 26, 2014. The borrowers under the Bank of America
Working Capital Facilities are PAEBVI, Parkmond and PARD Trade Limited, an indirect
subsidiary of the Debtor, in respect of which, the Debtor is a guarantor.

34.    **DBS Banking Facilities.** Banking facilities of approximately $9,000,000 in outstanding principal amount (the "**DBS Banking Facilities**") were made available by DBS Bank ("**DBS**") pursuant to a facility letter dated April 25, 2014. The borrower under the DBS Banking Facilities is PAEBVI, and the Debtor (among others) is a guarantor in respect of PAEBVI's obligations under the DBS Banking Facilities.

35.    **Standard Chartered Banking Facilities.** Banking facilities of approximately $27,000,000 in outstanding principal amount (the "**Standard Chartered Banking Facilities**") were made available by Standard Chartered Bank ("**SCB**") pursuant to a facility letter dated May 29, 2015. The borrowers under the Standard Chartered Banking Facilities are PAEBVI, Parkmond and Pacific Andes Food (Hong Kong) Company Limited, an indirect subsidiary of the Debtor, and the Debtor is a guarantor in respect of all obligations under the Standard Chartered Banking Facilities.

36.    **Sahara Investment Loans.** Loans of approximately S$6,250,000 in outstanding principal amount (the "**Sahara Investment Loans**") were made available by Sahara Investment Group Pte. Ltd. pursuant to loan agreements dated December 8, 2015 and December 10, 2015. The borrower under the Sahara Investment Loan is Golden Target Pacific Limited, an indirect subsidiary of the Debtor, and the Debtor (among others) is a guarantor in respect of the obligations under the Sahara Investment Loans.

37.    **United Overseas Bank Banking Facilities.** Banking facilities of approximately $23,000,000 in outstanding principal amount (the "**United Overseas Banking Facilities**") were made available by United Overseas Bank pursuant to a facility letter dated July 9, 2015. The borrowers under the United Overseas Banking Facilities are, among others, PAEBVI, and the Debtor is a guarantor in respect of PAEBVI's obligations under the United Overseas Banking Facilities.

11

38.    **Taipei Fubon Term Loan.** An unsecured facility in the principal amount of up to $72,000,000 of which the entire amount remains outstanding (the "**Taipei Fubon Term Loan**") was made available pursuant to a term loan facility agreement entered into on May 22, 2015 between Entie Commercial Bank Co., Ltd., Taishin International Bank, Taiwan Shin Kong Commercial Bank, First Commercial Bank, Ltd, Taiwan Cooperative Bank, Bank of Panshin, Chang Hwa Commercial Bank, Chailease International Financial Services Co., Ltd., as lenders, and Taipei Fubon Commercial Bank Co., Ltd., as agent and lender. The borrower under the Taipei Fubon Term Loan is Pacific Andes Food (Hong Kong) Company Limited, and the Debtor, among others, is a guarantor in respect of the Taipei Fubon Term Loan.

### III.    ISSUES LEADING TO COMMENCEMENT OF CHAPTER 11 CASE

#### A.  Overview

39.    In addition to the deterioration of the financial condition of the China Fishery Group, due in large part to the effects of El Nino weather conditions and circumstances directly related to the actions of the JPLs (as described at length in the June 30 First Day Declaration), which represented approximately 50% of its total annual revenue, the Debtor's financial condition was also severely and negatively impacted over the past 30 months due to the issues related to the Russian fishing industry and the drastic deterioration in market prices of the Alaskan Pollock, the Debtor's main operational business and source of revenue. Historically, a substantial part of the Debtor's revenues were derived from the frozen fish supply chain management operations of the PARD Group. As explained at paragraphs 16 to 19 above, through certain of its subsidiaries, the Debtor sourced large volumes of whitefish, such as Alaska Pollock and Cod, from international suppliers, in particular those operating in the North and South Pacific oceans.

12

40.    In 2014, as a result of the accession of Crimea to Russia in March 2014 and further conflict between Russia and Crimea at that time, U.S., European Union and certain other countries imposed economic sanctions on Russia. Following those sanctions, Russia reciprocated with import bans on seafood products from those countries involved. This very high profile political tension caused certain financial institutions to be reluctant to provide working capital for any Russia-related transactions, which adversely impacted PARD's ability to continue sourcing seafood raw material from Russian suppliers. In addition, the increased scrutiny of foreign funds into Russia also impacted the ability of the PARD Group to obtain sufficient working capital for its frozen fish business. Because the frozen fish business was so reliant upon working capital, the lack of available financing resulted in the Debtor's inability to purchase the agreed quantities of Alaskan Pollock from its suppliers. This not only caused revenues to decrease significantly, but also created an inability to meet obligations under the agreements with the Russian fishing companies with which the Debtor had significant prepayment balances.

41.    At the same time, the competitive dynamics among seafood processors in China also changed. Certain China based processors were prepared to operate fish processing facilities at no margin, or even at a loss, to generate cash flow to shore up property development portfolios which were badly in need of cash at that time. This put pressure on PARD's ability to purchase seafood raw material from Russian suppliers for processing in China at a price which would enable it to make a profit. One of the impacts of this change in dynamics was a reduction in volume purchased.

42.    A further consequence of PARD's inability to purchase sufficient Alaskan Pollock from the Russian fishing companies was a sudden oversupply of Alaskan Pollock, causing these suppliers to dump Alaskan Pollock into the free market and resulting in a

drastic decline in Alaskan Pollock prices. This also meant that the PARD Group was unable to sell Alaskan Pollock to its customers at the historical prices leading to a severe decline in revenue. This further exacerbated the cash flow problems of the PARD Group and ultimately the PARD Group concluded that it had to temporarily suspend its Alaskan Pollock operations due to these issues.

43.    Further, the suspension of its Alaskan Pollock operations also meant that difficulties arose in the settlement of the prepayments that had already been made by the PARD Group to the Russian fishing companies. Settlement efforts in this regard would require discussions and negotiations with these fishing suppliers who continued to have a claim against the PARD Group due to their failure to purchase the pre-agreed quantities of Alaskan Pollock (which it could no longer do at the pre-agreed prices in light of the approximately 30% decline in Alaskan Pollock prices).

44.    While I was not directly involved in the Alaskan Pollock business of the PARD Group, the foregoing sets forth my basic understanding of the manner in which the PARD Group conducted its Alaskan Pollock operations, which, for many years, contributed substantial amounts of revenue and profits to the PARD Group and the Pacific Andes Group - supported by the lenders of the Pacific Andes Group, including the very lenders who have now alleged wrongdoing (albeit without merit in fact or law) by the PARD Group in connection with its Alaskan Pollock operations.

45.    Concurrently with the operational and financial issues that the PARD Group was facing, the China Fishery Group's financial condition also deteriorated, largely because of the effects of El Nino on the anchovy fishery business which dominated the weather

14

pattern from 2014 through early 2016.[6] See e.g. June 30 First Day Declaration, ¶99. As set forth below, these adversities were further compounded by certain improper actions taken from November 2015 to January 2016 by or on behalf of a lender and JPLs (defined below) to the China Fishery Group. *See also* June 30 First Day Declaration, ¶¶100-141.

### B.   The Period before the Global Reorganization Efforts

46.   I refer to paragraphs 100 - 141 of the June 30 First Day Declaration which sets out the extensive damage that was caused to the Pacific Andes Group as a result of the actions of a single lender, HSBC, which were based solely upon an unverified report prepared by FTI Consulting ("**FTI**"), which was purportedly prepared at HSBC's direction without any consultation with management of the Pacific Andes Group.  It was a direct result of this unverified FTI report that the Hong Kong Court appointed the joint provisional liquidators ("**JPLs**"), and while the Hong Kong Court terminated the JPLs two months later, extensive damage was already done in the two month period during which they were appointed.

47.   While the damage caused by the JPLs to the Pacific Andes Group was most directly felt by the China Fishery Group, the other parts of the Pacific Andes Group (including the Debtor) were also severely impacted by the wrongful and unwarranted actions of HSBC and the JPLs. The appointment of the JPLs also led to the withdrawal of the remaining working capital facilities that were available to the PARD Group for the purposes of other elements of its business, such as its transportation and logistics business. In addition,

---

[6]       "During El Nino, upwelling brings up warm water with few nutrients.  A serious economic consequence of El Niño is its devastating effect on the Peruvian anchovy fisheries.  Populations of fish and seabirds vanish an anchovy catches dwindle during El Niño. http://oceanworld.tamu.edu/students/fisheries/fisheries2.htm; "The Peruvian anchovy fishery, which is the biggest single-species fishery in the world, typically collapses during El Niño events." August 14, 2015, http://www.nereusprogram.org/ask-an-expert-how-will-this-years-el-nino-affect-oceans-and-fisheries/;  A report regarding the effects of El Nino from April 1, 2014, stated that "[t]he weather phenomenon will particularly hit the anchovy stock and as a result the fishmeal industry . . ." https://www.undercurrentnews.com/2014/04/01/perus-anchovy-fishmeal-sector-set-for-strong-el-nino-effect-in-2014-expert-says.

the appointment of the JPLs led to a suspension in the trading of the shares of China Fishery Group Limited and PARD, which in turn, led to the ability of the SGD Bondholders to exercise a put option under the SGD Bonds. The exercise of the put option resulted in the entire $149 million bond issued by the Debtor becoming immediately due and payable (as opposed to the original maturity date of July 30, 2017).

48.     The appointment of the JPLs led to significant instability and disruption to the business of the Pacific Andes Group globally. Given the standing and importance of the Pacific Andes Group in the fishery industry, the alarm felt by suppliers, vendors and other similar stakeholders was immediate and resulted in significant cash flow and financial problems for the Pacific Andes Group. Given the suddenness of the appointment of the JPLs, various news and other media picked up the story immediately, and the media coverage was extremely speculative and negative, causing instability and damage to the Pacific Andes Group business.

49.     Although the JPLs were ultimately removed by the Hong Kong Court in January 2016, and the Pacific Andes Group, in furtherance thereof, entered into two deeds of undertaking, which, *inter alia*, provided further transparency of the operations for the lenders and committed to undertaking a proposed sale process for the China Fishery Group, the events that transpired during the period between January 20, 2016 and June 30, 2016 rendered it near impossible for the Pacific Andes Group to protect, preserve and realize value for its stakeholders given the single-minded objective of HSBC and BOA to consummate a fire-sale of the Peruvian fishmeal business, without regard to the true value of the business. In this regard, I refer to paragraphs 79 to 106 of my declaration filed in opposition to the lenders' motion for the appointment of a Chapter 11 trustee, detailing the Pacific Andes Group's

tireless efforts during the period before the Pacific Andes Group commenced its global reorganization efforts.

### C. **The Debtor's Reorganization Efforts in Singapore**

50.    The Debtor commenced reorganization efforts in Singapore on the basis that a legally effective restructuring under the Singapore Companies Act could be implemented. This was reinforced when the Singapore Court granted an order dated July 1, 2016 restraining all enforcement actions against the Debtor (and three (3) of its subsidiaries) with a view to facilitating, along with the foreign proceedings, a global plan of reorganization for the Debtor (the "**July Singapore Court Order**"). The July Singapore Court Order contemplated that creditors of the Debtor could not commence or continue any action or proceeding in Singapore or elsewhere, making the order effective against the Debtor's creditors generally, and not just within the territorial confines of Singapore. This was reinforced by the Singapore Court when the July Singapore Court Order was extended on August 8, 2016.

51.    My understanding of the Singapore scheme of arrangement regime and Section 210 of the Singapore Companies Act is that, unlike the bankruptcy regime in the United States, a stay of creditor enforcement efforts is not automatically granted to the debtor when it files an application under the Singapore Companies Act. Instead, a debtor has to specifically seek relief from the Singapore Court to stay all creditor actions while it formulates a reorganization plan, which will ultimately be voted on by creditors and sanctioned by the Singapore Court. The July Singapore Court Order provided the Debtor with such relief for a limited period of time, in order to enable the Debtor to pursue its reorganization efforts in conjunction with the other parts of the Pacific Andes Group. The Debtor was therefore required to seek extensions of the moratorium set out in the July Singapore Court Order from time to time as it continued its reorganization efforts.

52.     A critical factor in the Debtor's decision to undertake its reorganization efforts in Singapore (instead of United States) was the existence of holders of Singapore Dollar denominated bonds (the "**SGD Bonds**") in the Debtor's capital structure. The holders of the SGD Bonds (the "**SGD Bondholders**") are the single largest creditor constituency of the Debtor, holding approximately 34% in outstanding principal amount of the Debtor's outstanding indebtedness. Reorganization efforts in Singapore were initially undertaken with, *inter alia*, a view to providing effective participation for the SGD Bondholders in the reorganization process, almost all of whom are retail bondholders and were considered unlikely to have the experience, ability and financial resources to participate in a court-supervised restructuring outside of Singapore.

53.     The Debtor's application to the Singapore Court to extend the stay granted by the Singapore Court (which was due to expire on September 13, 2016) was met with objections from certain of the Debtor's lenders, all of whom have participated in the Chapter 11 cases of the Affiliated Debtors. In the pleadings filed by this small group of lenders before the Singapore Court, they revealed that their overriding objective in attempting to set aside the moratorium granted by the Singapore Court (or opposing its extension) was to appoint provisional liquidators over the Debtor with a view to taking ultimate control of the China Fishery Group, and the Peruvian fishmeal business of the group. Indeed, in the decision of the Singapore Court handed down on September 28, 2016, the Singapore Court found this intention of the lenders troubling and that such intentions would render the reorganization efforts of the Debtor nugatory.

54.     While the Singapore Court was in favour of the Debtor continuing to progress its reorganization efforts in Singapore, on September 26, 2016, in an oral judgment of the

Singapore Court delivered by Judicial Commission Kannan Ramesh,[7] the Singapore Court found that that it did not have jurisdiction to restrain creditors from taking actions outside of Singapore and therefore amended its previous orders accordingly, limiting the restrain on creditors from taking enforcement actions to only actions taken within the territorial confines of Singapore.  As a result, the Debtor no longer had the protections necessary while it attempted to structure a global reorganization and thus was compelled to file for chapter 11 protection in this Court.  On September 29, 2016, the Debtor filed an affidavit with the Singapore Court notifying it of its decision to withdraw from the Singapore Proceedings. I understand that under Singapore law, a debtor has the absolute right to withdraw its application under Section 210 of the Companies Act of Singapore, and PARD has done so in the Singapore Proceeding.

### D. Aggressive Actions by Bank Lenders and refusal to participate in Singapore Reorganization Proceedings

55.    Literally within hours of the Singapore Court's oral judgment (and before the Singapore Court handed down its written grounds of decision), the bank lenders, specifically Maybank, supported by Rabobank and allegedly, SCB, filed a winding up petition in the Supreme Court of Bermuda to liquidate the Debtor and also concurrently filed *ex parte* summons in the Supreme Court of Bermuda to immediately appoint provisional liquidators over the Debtor. These petitions filed with the Supreme Court of Bermuda were made without notice or reference to the Debtor, and despite the Singapore Court's written encouragement to bring the grounds of its decision and the notes of arguments in the Singapore proceedings to the attention of the Bermudian court, the lenders failed to do so. Surprisingly, in a letter from the Bermudian counsel of Rabobank to the Bermudian Court, Rabobank's explanation for its failure to notify the Debtor of its application to appoint

---

[7]    The written grounds of decision of the Singapore Court, spanning 57 pages, were only handed down on September 28, 2016.  A copy of the written grounds of decision of the Singapore Court is annexed hereto as Exhibit [I].

provisional liquidators was due its fear that the Debtor would file a petition under Chapter 11 of the Bankruptcy Code.[8]

56.     The Debtor was also alarmed to learn that the identities of the provisional liquidators proposed by Maybank, Rabobank and SCB who had consented to their appointment included Nicholas James Gronow of FTI, a person who was closely involved in the preparation of the very FTI Report prepared for HSBC in order to obtain the wrongful appointment of JPLs over the China Fishery Group.

57.     On the same day, BOA filed a petition in the Eastern Caribbean Supreme Court of the British Virgin Islands to wind up two of the Debtor's subsidiaries, PAEBVI and Parkmond.

58.     The clear lack of respect for a Singapore reorganization process, the limiting of the stay by the Singapore Court, and the steadfast intent of the lenders to take control of the Debtor in order to ultimately take control of the Peruvian fishmeal business rendered it impossible for the Debtor to implement any form of restructuring in Singapore. The bank lenders moved swiftly and aggressively in jurisdictions outside Singapore and took actions that were manifestly inconsistent with the intent of the Singapore Court (and arguably in violation of the automatic stay relating to the Affiliated Debtors who had previously filed chapter 11 bankruptcy cases before this Court) in facilitating the implementation of a restructuring or reorganization of the Debtor in Singapore. These actions left the Debtor with no viable alternative but to seek relief in the Bankruptcy Court, which now appears to be the only feasible way to achieve any form of reorganization of the Debtor that its aggressive bank lenders will respect. After the Debtor obtained notice of the applications filed with the Supreme Court of Bermuda, it made a decision to redeploy its reorganization efforts from

---

[8]     A copy of the letter from Bermudian counsel to Rabobank to the Supreme Court of Bermuda is annexed hereto as Exhibit [J].

Singapore to the United States given that the bank lenders clearly did not intend to participate or abide by any reorganization in Singapore. While it will now be more challenging for the SGD Bondholders to participate in the Debtor's reorganization, the Debtor is of the view that it was left with no option in light of the bank lenders' clear intention to single-handedly destroy the global reorganization efforts of the Pacific Andes Group, leaving little or no return for the other stakeholders of the Debtor, including the SGD Bondholders.

## IV.   THE DEBTOR'S CHAPTER 11 CASE

59.   A number of the indirect subsidiaries of the Debtor are the subject of restructuring proceedings in Peru.  These entities generate a substantial portion of the China Fishery Group's revenue and hence, revenue for the Debtor.  It is unclear how much cash will be available to the Debtor during the pendency of these cases.

60.   The Debtor intends to operate its business in the ordinary course during this Chapter 11 Case.  I have reviewed the Debtor's projected financial information which is primarily based on forecasted financial information of the China Fishery Group.  Based on the forecasts prepared by the Peruvian management team of the China Fishery Group, it is anticipated that post-petition revenue from operations will exceed $33 million per month from June 2016 to September 2016 and $44 million per month from December 2016 to February 2017.

## V.   THE DEBTOR'S FIRST DAY MOTIONS

61.   The Debtor is seeking only limited relief in its First Day Motions.  Receiving this Court's approval of the relief sought in the First Day Motions is, however, essential to transitioning the Debtor into Chapter 11 and providing the Debtor an opportunity to work towards a successful reorganization that will benefit all of the Debtor's constituents and stakeholders.

**a.**    **Motion for an Order Authorizing Joint Administration of the Debtor's Chapter 11 Case with its affiliates' Chapter 11 cases**

62.    The Debtor is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, of the other debtors within the Pacific Andes Group which have filed Chapter 11 Cases. The Debtor therefore requests that the Court jointly administer this Chapter 11 Case with the existing Affiliated Chapter 11 Cases. Joint administration will obviate the need for duplicative notices, motions, applications and orders, thereby saving considerable time for the Court and time and expense for the Debtor and its estates. I believe that joint administration will promote the fair and efficient administration of the Debtor's Chapter 11 Case and the Affiliated Chapter 11 Cases, and accordingly, respectfully submit that this motion should be approved.

**b.**    **Motion for an Order Enforcing Sections 362, 365(e)(1) and 525 of Bankruptcy Code**

63.    The Debtor has requested that the Court enter an order enforcing and restating the automatic stay, ipso facto and anti-discrimination provisions under sections 362, 365(e)(1) and 525 of the Bankruptcy Code. The Debtor is a leading international seafood company which serves customers worldwide. As a result, the Debtor has many foreign creditors, and other parties-in-interest in various countries who may not be well versed in the protections and restrictions of the Bankruptcy Code. Some of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business. Such circumstances warrant an order apprising parties—especially non-U.S. customers, creditors and vendors—of sections 362, 365(e)(1) and 525 and the protections provided thereby. Accordingly, I respectfully submit that this motion should be approved.

22

## VI.    INFORMATION REQUIRED BY
## LOCAL BANKRUPTCY RULE 1007-2

64.    Rule 1007-2 requires certain information related to the Debtor, which I have provided in the exhibits.    Specifically, these exhibits and the other exhibits contain the following information with respect to the Debtor:

(a)    **Exhibit A** provides an up-to-date corporate structure chart for the Debtor and its affiliates.

(b)    Pursuant to Local Rule 1007-2(a)(3), the name and address of the attorneys for the informal steering committee of holders of SGD Bonds is: Halperin Battaglia Benzija, LLP, 40 Wall Street, 37th Floor, New York, NY 10005, United States of America, Attn: Alan Halperin.

(c)    Pursuant to Local Rule 1007-2(a)(4), **Exhibit B** attached hereto provides the following information with respect to each of the holders of the Debtor's 50 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address) and telephone number; the name(s) of person(s) familiar with the Debtor's account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

(d)    Pursuant to Local Rule 1007-2(a)(5), the Debtor represents there are no holders of secured claims.

(e)    Pursuant to Local Rule 1007-2(a)(6), **Exhibit C** attached hereto provides a summary of the Debtor's assets and liabilities.

(f)      Pursuant to Local Rule 1007-2(a)(7), the Debtor has 8,623,786,208 shares of common stock outstanding, held by approximately 8,270 registered holders. The Debtor is compiling the information required under this rule.

(g)      Pursuant to Local Rule 1007-2(a)(8), the Debtor represents that there is no property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity.

(h)      Pursuant to Local Rule 1007-2(a)(9), **Exhibit D** attached hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtor operates its business.

(i)      Pursuant to Local Rule 1007-2(a)(10), the Debtor's books and records are located at Rooms 3201-10, Hong Kong Plaza, 188 Connaught Road West, Hong Kong.  The Debtor's major assets that are located outside of the United States are set forth on **Exhibit E** attached hereto.

(j)      Pursuant to Local Rule 1007-2(a)(11), **Exhibit F** attached hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property where a judgment or seizure of their property may be imminent.

(k)      Pursuant to Local Rule 1007-2(a)(12), **Exhibit G** attached hereto sets forth a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

(l)      Pursuant to Local Rule 1007-2(b)(3), **Exhibit H** attached hereto provides a schedule for the 30-day period following the filing of the Chapter 11 Cases, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to

24

accrue but remain unpaid, other than professional fees, and any other information relevant to

an understanding of the foregoing.

[*Signature Page Follows*]

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the

United States of America that the foregoing statements are true and correct to the best of my

knowledge, information and belief.

Executed on October _10_ , 2016

in Hong Kong, Special Administrative Region of the People's Republic of China