Frederick D. Hyman
Christine A. Walsh
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone No.:  212 506-2500
Facsimile No.:  212 262-1910

*Attorneys for Malayan Banking Berhad,*
*Hong Kong Branch*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PACIFIC ANDES RESOURCES DEVELOPMENT LIMITED,** | **Case No. 16-12739 (JLG)** |
| Debtor. | |

---

**MAYBANK'S MOTION FOR AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE PURSUANT TO SECTIONS 305(a) AND/OR 1112(b) OF THE BANKRUPTCY CODE, WITH PREJUDICE OR, ALTERNATIVELY, LIFTING THE AUTOMATIC STAY PURSUANT TO SECTION 362(d)(1) OF THE BANKRUPTCY CODE**

Malayan Banking Berhad, Hong Kong Branch ("**Maybank**"), by and through its undersigned counsel, hereby requests entry of an Order (a) dismissing the Chapter 11 case (the "**Case**") filed by Pacific Andes Resources Development Limited ("**PARD**") pursuant to Sections 305(a) and/or 1112(b) of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), with prejudice, or alternatively (b) lifting the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code (the "**Motion**") to allow Maybank to proceed with the winding-up petition previously filed in Bermuda at Case No. 2016: No. 354, *In the Matter of the Pacific Andes Resources Development Limited and in the Matter of Companies Act 1981* (the

"**Bermuda Proceeding**") and the related application to appoint Joint Provisional Liquidators ("**JPLs**").

As demonstrated below, the instant Case was initiated as a tactical ploy by PARD to frustrate the legitimate efforts of its principal creditors to recover amounts due to them, initially, in connection with the application filed by PARD in Singapore under Section 210 (10) of the Companies Act of the Republic of Singapore at Case No. 668 of 2016 *In the matter of Section 210(10) of the Companies Act (Cap 50, 2006 Rev Ed) and in the matter of Pacific Andes Resources Development Limited* (the "**Singapore Proceeding**"), and later, in the Bermuda Proceeding that was halted only hours before the initial hearing as a result of the filing by PARD of its bare-bones Chapter 11 petition.  Indeed, PARD admits that the filing of this Case is for the sole purpose of taking advantage of the extraterritorial relief of the automatic stay under Section 362 of the Bankruptcy Code.  This bankruptcy proceeding bears the telltale signs of a pre-textual and "bad faith" filing and, as such, should be dismissed.  PARD's forum shopping should not be countenanced, and instead its rights and those of its creditors should be determined by the venue that was originally chosen by PARD to be the most appropriate for addressing its concerns in connection with an insolvency strategy for the Pacific Andes Group[1].  If this Case were allowed to proceed, the U.S. would be the third forum where PARD's creditors would be seeking recompense for the considerable obligations owing to them.  In support of its Motion, Maybank states as follows:

---

[1] As that term is defined in the *Declaration of Ng Puay Yee Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* Case No. 16-11895 (JLG), ECF. No. 2 ("**6/30/16 Declaration**") at ¶ 4.

## I.    PRELIMINARY STATEMENT

1.    The filing of this Case is abusive and should be dismissed with prejudice. Without any creditors, business activities or relationships in the U.S. of its own, PARD, an entity organized under the laws of Bermuda, should not be entitled to relief under the Bankruptcy Code and, in particular, the benefits of a global automatic stay.

2.    Beginning in late 2015, recognizing the need to restructure or reorganize their many businesses operated through a web of not fewer than 150 entities, senior representatives of the Pacific Andes Group consulted with their many advisors to determine, among other things, the most appropriate venue or venues should the need for insolvency arise.  As a result of those discussions, and as further discussed below, a global strategy was developed that would ultimately lead to the commencement of insolvency proceedings currently pending in four jurisdictions (and at least three other jurisdictions which have been discharged for a variety of reasons): (a) four entities (including PARD) commenced the Singapore Proceeding; (b) sixteen entities[2] commenced Chapter 11 cases and are currently before this Court (excluding PARD); (c) three entities[3] commenced proceedings in Peru, and also filed Chapter 15 petitions with this Court but have yet to achieve recognition; (d) four entities[4] commenced proceedings in Germany, and filed Chapter 15 petitions with this Court but have yet to achieve recognition; (e)

---

[2] N.S. Hong Investment (BVI) Limited ("**NS Hong**"), Super Investment Limited (Cayman) ("**Super Investment**"), Pacific Andes International Holdings Limited (Bermuda) ("**PAIH**"), China Fishery Group Limited (Cayman) ("**CFGL**"), Smart Group Limited (Cayman) ("**Smart Group**"), Protein Trading Limited (Samoa) ("**Protein Trading**"), South Pacific Shipping Agency Limited (BVI) ("**SPSA**"), CFG Peru Investments Pte. Limited (Singapore) ("**CFG Peru Singapore**"), China Fisheries International Limited (Samoa) ("**CFIL**"), Growing Management Limited (BVI) ("**Growing Management**"), Chanery Investment Inc. (BVI) ("**Chanery**"), Champion Maritime Limited (BVI) ("**Champion**"), Target Shipping Limited (HK) ("**Target Shipping**"), Fortress Agents Limited (BVI) ("**Fortress**"), CFGL (Singapore) Private Limited ("**CFGLPL**") and Ocean Expert International Limited (BVI) ("**Ocean Expert**") (collectively, the "**Existing Debtors**").

[3] CFG Investment S.A.C. ("**CFG**"), Corporacion Pesquera Inca S.A.C. ("**Copeinca**") and Sustainable Fishing Resources, S.A.C. (collectively, the "**Peruvian Debtors**").

[4] Pickenpack Holding Germany GMBH, Pickenpack Europe GMBH, Pickenpack Production Lüneburg GMBH and TST The Seafood Traders GMBH.

Richtown Development Limited is subject of an insolvency proceeding in the British Virgin Islands; and (f) proceedings that had been commenced in Hong Kong, France and the Cayman Islands are no longer continuing. As a result of these many filings, creditors of the Pacific Andes Group have had little choice but to retain counsel in multiple jurisdictions in an effort to protect their interests and pursue recovery of amounts duly owing to them.

3.     In a coordinated effort with other members of the Pacific Andes Group, PARD, despite having alternative forums available to it, commenced the Singapore Proceeding on July 1, 2016, nearly four months ago. Similar to the Chapter 11 cases of the Existing Debtors, the Singapore Proceeding was adversarial from the outset, as PARD sought to impose an extraterritorial stay with respect to all actions against PARD. However, in a thoughtful decision months after the commencement of the Singapore Proceeding, the Singapore court ultimately determined that it could not apply an extraterritorial stay, but rather confirmed a stay only as to actions against PARD in the Singapore courts. On the heels of the Singapore court's ruling, Maybank, one of PARD's largest creditors, filed the Bermuda Proceeding seeking a winding-up of PARD and the appointment of the JPLs in an effort to kick-start genuine investigations, and potential recovery actions, regarding a series of questionable transfers. Unhappy with the ruling in Singapore and Maybank's course of action in Bermuda, PARD immediately sought shelter in the U.S. (despite having declined to do so in conjunction with the Existing Debtors).

4.     As a prerequisite to its filing, PARD sought to manufacture jurisdiction by funding a retainer to its new proposed U.S. bankruptcy counsel on the same day that PARD's Case was commenced. Although PARD had seemingly funded a portion of the retainers of U.S. professionals in December 2015, it did so as a "Non-Client Funder" and had acknowledged that it had no reversionary interest in those funds. To Maybank's knowledge, PARD has no assets in

4

the U.S. other than the professional fee retainer funded moments before (presumably, although perhaps concurrently with or even after) it commenced this Case.

5.     The third time cannot be the charm in this instance—the relevant facts overwhelmingly indicate that PARD belongs in a foreign insolvency proceeding.  First, PARD is a Bermuda-incorporated company and listed on the Singapore Exchange Securities Trading Limited.  Second, with one immaterial exception, each of the members of the Pacific Andes Group is organized in foreign jurisdictions.  Third, PARD has no offices or employees in the U.S.  Fourth, PARD has no business or operations reasonably susceptible to rehabilitation and operates wholly on foreign soil.  Fifth, PARD's loan documents with Maybank (and, it is understood, other lenders) are governed by foreign law and provide for foreign courts to have jurisdiction over disputes thereunder.  Sixth, all of PARD's creditors are foreign entities.  Seventh, PARD has engaged in forum shopping in an effort to frustrate and delay the legitimate recovery efforts of its creditors.  Lastly, PARD has blatantly attempted to manufacture jurisdiction in the U.S.  Moreover, the interests of PARD's many creditors would be better served by a dismissal, opening an opportunity to engage in good faith investigative and recovery actions on an expedited basis thus curtailing the continuing loss to and diminution in PARD's estate.

6.     PARD, with virtually no links to the U.S. and having sought protection in another foreign jurisdiction, cannot be permitted to abuse the protections of the U.S. bankruptcy courts solely in order to frustrate (i) those foreign proceedings properly commenced before other sovereign courts and (ii) remedies of foreign businesses dealing with non-U.S. businesses and entities.  Even if this Court were to conclude that the eligibility statute of the Bankruptcy Code is written broadly, it should not be blindly applied so as to permit a foreign entity to fabricate "a

mere peppercorn" interest in the U.S. to justify placing jurisdiction before a U.S. Bankruptcy Court with the intent of supplanting all other foreign proceedings and foreign business transactions with little or no U.S. ties. But, more important, the dismissal and abstention statutes of the Bankruptcy Code are written broadly as well, requiring dismissal of a case for "cause" and allowing dismissal or abstention, especially if the interests of creditors and the debtor would be better served by such dismissal or abstention, as is the case here.

7.      This Chapter 11 proceeding serves only to hinder, delay and frustrate Maybank and other prepetition creditors from pursuing their rights as creditors in forums chosen by, or made available by, the choices of PARD. The filing is inimical to and subverts the very purpose of Chapter 11. Importantly, given the lack of operations of PARD and its immediate group affiliates, the remedies of investigation and possible recovery actions available to provisional liquidators and liquidators in PARD's jurisdiction of incorporation may well be the only material sources of recovery open to creditors. Importantly, appointment of such liquidators in Bermuda need not preclude restructuring efforts of the Pacific Andes Group, including PARD, if they are found ultimately to be in the best interests of creditors.

8.      For the reasons stated herein, Maybank requests that the Court dismiss the Case to allow for the prompt, efficient and orderly pursuit of creditor rights and remedies in the Bermuda Proceeding and other applicable foreign jurisdictions.

## II.      **JURISDICTION**

9.      This Court has jurisdiction over the Motion, pursuant to 28 U.S.C. §§ 1334 and 157(b). The Motion is a core matter within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §1409. The statutory basis for the relief requested herein is Sections 105, 305(a), 349(a), 362(d) and 1112(b) of the Bankruptcy Code.

### III.    FACTUAL BACKGROUND

**A.    Maybank as Creditor.**

10.    Pursuant to a letter of offer dated August 21, 2014 (the "**Facility Letter**"), Maybank extended certain banking facilities (which include trade facilities and a revolving credit facility in the aggregate sum of US$65,000,000, and foreign exchange and derivative facilities for a notional principal limit of US$20,000,000) (the "**Facility**") to Pacific Andes Enterprises (BVI) Limited ("**PAE**") and Parkmond Group Limited ("**PGL**"). The trade facilities and the revolving credit facility are repayable on demand. The Facility is governed by Hong Kong law.

11.    The obligations of PAE and PGL under the Facility are guaranteed by PARD by way of a corporate guarantee dated August 26, 2014, by which PARD guaranteed the liabilities of both PAE and PGL under the Facility Letter. The guarantee is also governed by Hong Kong law.

**B.    PARD.**

12.    PARD is a Bermuda incorporated company listed on the Singapore Exchange Securities Trading Limited. *See* 6/30/16 Declaration at ¶ 31; *Declaration Of Ng Puay Yee Pursuant To Rule 1007-2 Of The Local Bankruptcy Rules For The Southern District Of New York And In Support Of Debtor's First Day Motions And Applications*, Dkt. No. 13 ("**10/10/16 Declaration**") at ¶¶ 15, 21; Petition; Written Resolution of All Directors of the Company Passed Pursuant to the Company's By-Laws on 28 Sept. 2016 ("**Written Resolution**"); pg. 1. PARD's business consists of global sourcing, transportation, logistics and supply of frozen seafood products to the international markets. *See* 10/10/16 Declaration at ¶ 8.

### i.  *PARD's Lack of Business and Operations*

13.     PARD is a holding company for subsidiaries engaged in the fishing industry.  *See id*.  Maybank understands that PARD's subsidiaries are organized into two main divisions: (a) a frozen fish business, which operated mainly through the "**PARD Group**" (comprising PARD, PAE, PGL and Pacific Andes Food (Hong Kong) Company Limited ("**PAF**")), and (b) the Peruvian Business (as defined below) of which PARD is not involved in the day-to-day operations.  *See generally id*. at ¶¶ 8-9.

14.     Experience has shown that the PARD Group's business model was not viable and has proven unable to generate cash flows sufficient to service its considerable existing debt.  The business and trading level of the PARD Group has largely been abandoned with no meaningful business that can be restructured or resuscitated.  *See generally id*. at ¶¶ 19, 24.  To date, any working capital has evaporated and third-party financing has been unavailable.  *See generally id*. at ¶ 8.  As a result, the only source of recovery for PARD's creditors, in addition to a sale of the Peruvian Business and related assets, is the pursuit of recovery actions.

### ii.  *Questionable Prepayments and Transactions*

15.     As has been noted in other pleadings, interested parties have expressed serious concerns regarding payments or pre-payments to agents in Russia reflected in the PARD Group's balance sheet as of June 30, 2015.   Additional concerns have been raised regarding the reclassification of approximately $155 million from prepayments to an amount paid by PARD Group to subscribe for rights issued in respect of shares of China Fishery Group Limited ("**CFGL**") for the benefit of third-party minority shareholders.  To date, no explanation has been forthcoming regarding these transactions, and Maybank is not aware of any efforts by PARD to seek return or recovery.

16.      Maybank provided trade finance under trust receipts with PAE, a member of the PARD Group.  Under the financing arrangement, (a) PAE would request remittance of payment to a third party, such as Solar Fish Trading Ltd., declaring that the "underlying trade transactions are genuine," (b) the trust receipt executed on behalf of PAE would state that the relevant fish have been "hypothecated to the Bank as collateral security for the due acceptance and payment of the undermentioned draft drawn upon [PAE]," and (c) receipt documents showing details of the shipment would be provided to Maybank.  Accordingly, Maybank remained the owner of the goods, and PAE agreed to sell the fish as Maybank's agent, to hold the proceeds as trustee for Maybank and to account for them.  To date, matured trust receipts of approximately $47.8 million in principal owing to Maybank remain outstanding.  It remains unclear to Maybank where the fish (subject to a hypothecation to Maybank) or the proceeds of their sale have gone.

### iii.    *Peruvian Businesses*

17.      The Hongkong and Shanghai Banking Corporation Limited ("**HSBC**"), one of the Club Lenders under that certain US$65,000,000 facility agreement dated March 20, 2014 between, among others, CFG, Copeinca and China Fisheries International Limited ("**CFIL**"), filed (i) a petition in Hong Kong for a winding up and appointment of JPLs ("**HK JPLs**") on November 25, 2016 and (ii) a petition in the Cayman Islands for the winding up and appointment of JPLs ("**Cayman JPLs**") on November 27, 2015 in respect of debtors CFGL and CFIL, the ultimate parents of CFG and Copeinca (Copeinca together with CFG, the "**Peruvian Opcos**" and the Peruvian Opcos together with CFGL and CFIL, the "**CF Group**").  *See* 6/30/16 Declaration at ¶ 114.  As a result of those proceedings and subsequent constructive negotiations with their creditors, the Pacific Andes Group entered into two separate court-sanctioned deeds of undertaking: the first dated December 28, 2015 among Pacific Andes International Holdings

Limited ("**PAIH**") and PARD, an indirect subsidiary of PAIH, several Club Lenders and the Hong Kong High Court (the "**PAIH/PARD Undertaking**"), and the second dated January 20, 2016 among CFGL, CFIL and HSBC ("**CFGL/CFIL Undertaking**" and together with the PAIH/PARD Undertaking, the "**Undertakings**").    *See generally id.* at ¶ 120; 10/10/16 Declaration at ¶ 49.    Under the CFGL/CFIL Undertaking, it was agreed to appoint an independent Chief Restructuring Officer ("**CRO**") (Mr. Paul Brough) and to appoint an independent reporting accountant (Grant Thornton Recovery & Reorganisation Limited) to provide transparency and conduct a sale process for the fishery business and fish processing plants in Peru (the "**Peruvian Business**") operated by the Peruvian Opcos, to maximize value for stakeholders.    *See generally* 6/30/16 Declaration at ¶¶ 129, 131.    The Peruvian Business is the most valuable asset of the Pacific Andes Group.    *See id.* at ¶ 74; 10/10/16 Declaration at ¶ 26.    In consideration of the Undertakings to allow independent supervision and compliance with certain obligations, HSBC agreed to, and did, seek and obtain orders dismissing the petitions for winding-up of and appointment of JPLs in Hong Kong and the Cayman Islands and to forego any appeal of the same in Hong Kong.    *See* 6/30/16 Declaration at ¶ 120.    However, the CFGL/CFIL Undertaking included a condition that if the Peruvian Business was not sold by July 15, 2016, the CF Group agreed to immediate reappointment of the Cayman JPLs.    *See id.*

18.    Further, pursuant to the PAIH/PARD Undertaking, the relevant entities undertook and covenanted in favor of certain of the Club Lenders to, among other things, appoint a CRO (Mr. Patrick Wong) and to engage an independent accounting firm to conduct an independent forensic review in relation to the financial aspects of certain members of the Pacific Andes Group, particularly PAIH and PARD.    Subsequently, PricewaterhouseCoopers ("**PwC**") was appointed as independent forensic accountant to conduct the forensic review and also as

independent reporting accountant. *See Declaration of Ng Puay Yee In Opposition To The Lenders' Motion For The Entry of An Order Directing The Appointment of A Chapter 11 Trustee Pursuant To 11 U.S.C. §1104(A)(2)* Case No. 16-11895 (JLG), ECF. No. 105; ¶ 30. The forensic review commenced on March 17, 2016 and had not been completed when PAIH decided on July 5, 2016, to appoint RSM Corporate Advisory (Hong Kong) Limited ("**RSM**") in place of PwC to complete the forensic review. *See generally id.* at ¶¶ 30-32.

### iv.    *Chapter 11 Cases of Existing Debtors*

19.    On June 30, 2016, roughly two weeks before the deadline for the sale of the Peruvian Business, the Pacific Andes Group began implementing their global insolvency strategy. On that date, the Existing Debtors filed for Chapter 11 protection. The filing of the Existing Debtors appeared designed to avoid the sale of the Peruvian Business and resulted in the resignation of the CRO overseeing and implementing the sale process. A motion is pending in the cases of the Existing Debtors for an appointment of a Trustee on account of creditor concern over current management and transparency, among other things.

### v.    *Peruvian Action and Related Chapter 15 Cases of Peruvian Debtors*

20.    Also on June 30, 2016, the Peruvian Debtors (a) commenced proceedings in Peru before the El Instituto de Defensa de la Competencia y de la Proteccion de la Propiedad Intelectual pursuant to Article 26 of the General Law of the Bankruptcy System (Law No. 27809) (the "**Peruvian Proceeding**") and (b) sought recognition of the Peruvian Proceeding as a foreign main proceeding pursuant to 11 U.S.C. § 1515 of the Bankruptcy Code. *See generally* 6/30/16 Declaration at ¶ 144; 10/10/16 Declaration at ¶ 59.

vi.    *Singapore Action*

21.    The following day, on July 1, 2016, PARD, for itself and three of its subsidiaries, PAE, PGL and PAF, voluntarily made an application under Section 210(10) of the Singapore Companies Act, Chapter 50 seeking a moratorium against all actions and legal proceedings previously brought or to be brought against them by their creditors, in Singapore and globally. *See* 10/10/16 Declaration at ¶ 13; Oral Judgment of the High Court of the Republic of Singapore ("**Singapore Decision**"), *In the matter of Section 210(10) of the Companies Act (Cap 50, 2006 Rev Ed) and in the matter of Pacific Andes Resources Development Limited*; Originating Summons No. 668 of 2016; attached to 10/10/16 Declaration at Exhibit I; at ¶ 2.    PARD benefited from a temporary extraterritorial stay from July 1, 2016 until September 26, 2016.  *See* 10/10/16 Declaration at ¶ 51; Singapore Decision at ¶ 3.  After hearing arguments on September 13, 2016, the High Court of Singapore on September 26, 2016, issued the Singapore Decision limiting the stay to PARD such that it only restrained creditor action within the territory of Singapore[5].  *See* 10/10/16 Declaration at ¶ 54; Singapore Decision at ¶ 29.  The Court determined that it did not have jurisdiction to restrain creditors from commencing proceedings extraterritorially.  *See* 10/10/16 Declaration at ¶ 54.

22.    Having failed to maintain the extraterritorial stay under the Singapore Proceeding, PARD not only filed the instant Case in order to obtain an automatic stay under Section 362 of the Bankruptcy Code, but also filed an affidavit withdrawing itself from the Singapore Proceeding (the "**Withdrawal Affidavit**").  *See id*; Written Resolution at pg. 1 (stating as a basis for the filing of this Case "in light of the decision of the Singapore Court on September 26, 2016 which restrains proceedings against [PARD] in Singapore but no longer elsewhere, [PARD] is no

---

[5] The High Court of Singapore also dismissed the cases of PAE, PGL and PAF as it determined such entities do not have a sufficient nexus to Singapore.  *See* Singapore Decision at ¶ 10.

longer able to obtain adequate protection against creditor actions and/or to undertake an effective restructuring of [PARD] in Singapore"). The Singapore Decision noted that the Singapore Court's inherent jurisdiction should not be exercised to prevent commencement of proceedings outside of Singapore in this case. *See* Singapore Decision at ¶ 27.

23.    In the Singapore Proceeding, and prior to PARD's withdrawal of its Section 210(10) application, the learned Judicial Commissioner had also indicated to the parties that he was only likely to consider extending the moratorium for PARD in Singapore until January 13, 2017 pursuant to the following conditions: (a) PARD was to file an application pursuant to section 210(1) of the Singapore Companies Act by January 13, 2017, and (b) a CRO was to be appointed on terms acceptable to the Singapore court, and at the expense of PARD. *See id.* Parties were to address the Court on the terms of the appointment at a hearing on October 12, 2016. However, rather than addressing the terms of reference for the proposed CRO, PARD filed the Withdrawal Affidavit. *See* 10/10/16 Declaration at ¶ 54.

### vii.    *Bermuda Action*

24.    On September 26, 2016, after the Singapore Decision was rendered, Maybank filed the Bermuda Proceeding in the Supreme Court of Bermuda including the winding-up petition and an *ex parte* summons on notice to appoint JPLs over PARD.[6] *See id.* at ¶ 55.

### viii.    *PARD's Chapter 11 Petition*

25.    On September 29, 2016 (the "**Petition Date**"), the day before the Bermuda Proceeding was first scheduled for hearing, PARD filed a voluntary petition for relief under Chapter 11 [Dkt. No. 1].

---

[6] Around the same time, Bank of America also filed winding-up applications against PAE and PGL in the Eastern Caribbean Supreme Court of the British Virgin Islands. *See* 10/10/16 Declaration at ¶ 57.

26.     Aside from filing its petition, PARD did not seek any relief from this Court for nine days following commencement of the Case, and, even then, filed very few substantive motions.  The initial case conference is scheduled to be held on October 25, 2016, four weeks after PARD's filing.

**C.     PARD's Contact to the U.S. is Negligible.**

27.     As of the Petition Date, PARD has no identifiable U.S. contacts or any history in its business.  *See Statement of Financial Affairs*, Dkt. No. 21-2 ("**SOFAs**"); *Schedules* Dkt. No. 21.  PARD is organized under foreign law, and its shares are listed under a foreign exchange. *See* 6/30/16 Declaration at ¶ 31; 10/10/16 Declaration at ¶¶ 15, 21; Written Resolution at pg. 1. PARD's creditors are foreign institutions, with debts and obligations arising under foreign laws and in foreign jurisdictions, related to goods and services provided in foreign jurisdictions. PARD has no offices or employees in the U.S.  *See* SOFAs; *Schedules* Dkt. No. 21.

28.     Indeed, the only property located in the U.S. that PARD may seemingly have had on the Petition Date is a possible reversionary interest in respect of a nominal retainer paid to its proposed counsel, Klestadt Winters Jureller Southard & Stevens, LLP ("**KWJS&S**") sometime on the Petition Date.  *See* SOFAs at pg. 6.  PARD explains that "KWJS&S received a retainer deposit in the amount of $202,006.12 on September 29, 2016.  Of that amount KWJS&S received $113,349.12 from the Debtor's prior counsel, MSEK.  Upon information and belief, [PARD] originally transferred $113,349.12 to MSEK prepetition as part of a retainer paid to MSEK.  The remaining $88,717.00 was received directly from [PARD]."[7]  *Application for an order Approving the Retention of Klestadt Winters Jureller Southard & Stevens, LLP*; Dkt. No. 18 (the "**KWJS&S Application**").

---

[7] It is noteworthy that the KWJS&S engagement letter is not attached to the retention application.

14

29.     Of the $202,006.12 purportedly received by KWJS&S on the Petition Date, PARD itself transferred only $88,717.00.  *See id.* at ¶ 10.  The remainder of the retainer was transferred on the Petition Date from Meyer, Suozzi, English & Klein, P.C. ("**MSEK**").  *Id.* PARD, however, erroneously identifies MSEK as prior counsel to PARD.  Rather, MSEK is counsel to the Existing Debtors.  *See Debtors' Application For Entry of Order Authorizing Retention and Employment of Meyer Suozzi, English & Klein, P.C. As Counsel For Debtors and Debtors In Possession Effective Nunc Pro Tunc to the Petition Date*, Case. No. 16-11895; ECF No. 34 ("**MSEK Application**").

30.     PARD may indeed have transferred funds to MSEK in connection with MSEK's representation of the Existing Debtors.  However, it seemingly did so on behalf of the Existing Debtors and retained no reversionary interest in such amounts.  As set forth in the Engagement Letter dated April 14, 2016 ("**4/14/16 Engagement Letter**") attached to the MSEK Application, PARD was identified as one of the "Non-Client Funders" and the letter expressly states that ". . . despite the fact that part of the retainer was, and future retainer may be, provided by the Non-Client Funders, the Non-Client Funders are not currently clients of MSEK hereunder and MSEK's duties as counsel run solely to the Clients."  4/14/16 Engagement Letter at p. 3. Further, the 4/14/16 Engagement Letter states that ". . . each Client holds an indivisible interest in the entire balance of the retainer and the Non-Client Funders hold no interest therein."  *Id.* at pg. 2.  All parties to the 4/14/16 Engagement Letter agreed that PARD did not have any interest in the retainer funds, and therefore, such amounts are not "property" held by PARD in the U.S.

31.     The only transfer made from PARD to a U.S. account on its own behalf, and for its own counsel, was the payment made to KWJS&S on the Petition Date.  Maybank cannot

determine whether any payments made to KWJS&S were received prior to 11:59 a.m. eastern time when PARD filed its voluntary petition. *See* Petition.

### IV.    <u>REQUESTED RELIEF</u>

32.    Section 1112(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the court shall … dismiss a case under this chapter … for cause." 11 U.S.C. § 1112(b)(1).[8]

**A.    Cause Exists to Dismiss This Bankruptcy Case Under Section 1112(b)(1) <u>Because the Petition Was Filed in Bad Faith</u>.**

33.    Chapter 11 bankruptcy petitions are subject to dismissal under Section 1112(b)(1) of the Bankruptcy Code unless filed in good faith. *C-TC 9th Ave. P'ship v. Norton Co.* (*In re C–TC 9th Avenue P'ship),* 113 F.3d 1304, 1310 (2d Cir. 1997) (stating that implicit good faith standard is required for bankruptcy petitions because it "furthers the balancing process between the interests of debtors and creditors."). The burden is on the bankruptcy petitioner to establish good faith once good faith is called into question. *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001) (internal citations omitted). The moving party bears the initial burden of demonstrating cause for dismissal under Section 1112(b) of the Bankruptcy Code. *Fraternal Composite Servs., Inc. v. Karczewski (In re Fraternal Composite Servs., Inc.)*, 315 B.R. 253, 256 (N.D.N.Y. 2004); *In re Strawbridge*, No. 09-17208 (MG), 2010 WL 779267, at *4 (Bankr. S.D.N.Y. Mar. 5, 2010). Once that burden has been met, the burden shifts to the debtor "to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate." *Id.* "When the record is sufficiently well developed to allow the bankruptcy court to draw the necessary inferences to dismiss a Chapter

---

[8] Prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, dismissal under Section 1112(b) was merely within the discretion of the court. Such relief is now mandatory where the movant establishes cause.

11 case for cause, the bankruptcy court may do so." *In re C-TC 9ᵗʰ Ave. P'ship*, 113 F.3d at 1312.

34.     In addition to the statutorily enumerated examples, courts considering whether cause exists to dismiss a case have determined that "cause . . . may [also] be found based on unenumerated factors, including 'bad faith.'" *In re Kaplan Breslaw Ash*, *LLC,* 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2001); *see In re Syndicom*, 268 B.R. at 31 (considering the "totality of the circumstances").

35.     The court noted in *In re Island Helicopters, Inc.,* 211 B.R. 453, 462 (Bankr. E.D.N.Y. 1997) that "[t]he good-faith requirement has long been the policing mechanism of Bankruptcy Courts to make certain that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy reorganization philosophy and for no other purpose." Courts in this circuit make a subjective and an objective inquiry into whether "there has been an abuse of the provisions, purpose or spirit" of the Bankruptcy Code or the relevant chapter. *See In re Syndicom*, 268 B.R. at 49.

36.     PARD did not commence this Case under Chapter 11 with a plan to reorganize its business. Rather, PARD filed an emergency Chapter 11 petition in response to the actions taken by Maybank and to frustrate indefinitely the ability of both Maybank and PARD's other creditors to exercise their legal and contractual rights vis-à-vis their respective collateral. In fact, the Declaration of Ng Puay Yee in support of PARD's petition (filed twelve days after the Petition Date) states that the application by Maybank commencing the Bermuda Proceeding ". . . left [PARD] with no viable alternative but to seek relief in the Bankruptcy Court. . . ." 10/10/16 Declaration at ¶ 58.

37.     Indeed, the reorganization "strategy" is simply to hide behind the protection of the automatic stay and wait until some unknown point in the future.   Hope is not a viable reorganization strategy.   Such misuse of the Chapter 11 process should be neither tolerated nor encouraged.   PARD must actively "demonstrate something more—its own affirmative steps to improve its chances for a successful reorganization."   *In re 234–6 West 22nd St. Corp.,* 214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997).

38.     The Pacific Andes Group should not be permitted to use the global insolvency regime as its own game of "three-card monte"—they lead creditors to spend time and valuable resources on a jurisdiction of their choosing only to lift the cup and display an insolvency in another.   Their actions regarding PARD are the very definition of forum shopping.

      **i.**     ***PARD Has Tried To Manufacture U.S.-Debtor Eligibility.***

39.     PARD has tried to manufacture debtor eligibility, jurisdiction, and venue in bad faith.   To qualify for relief under Chapter 11, a debtor must satisfy the criteria set forth in Section 109(a) of the Bankruptcy Code:   "[O]nly a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under [title 11]."   11 U.S.C. § 109(a).

40.     As PARD certainly does not have a place of business in the U.S., its only "mere peppercorn" ties to the U.S. are certain retainer payments.   As discussed above, the deposits with MSEK were payments made for affiliates of PARD that, once the funds were wired, PARD explicitly ". . . hold[s] no interest therein."   *See* 4/14/16 Engagement Letter at pg. 2.   Therefore, the payments made by PARD to MSEK are contractually not part of the property of PARD.   The attempt to now try to fabricate that the payment made to MSEK, who explicitly was not PARD's counsel, and payment of which explicitly did not remain PARD's property, is insufficient.

18

Because they have no other nexus, PARD and its *only* proposed counsel, KWJS&S, are attempting to create a legal fiction by which they declared these funds belong to PARD.

41.     The only property that PARD seemingly had in the U.S. on the Petition Date is its retainer deposit with KWJS&S made the day of its filing.  *See Statement of Financial Affairs*, Dkt. No. 21-2; pg. 6.  Such deposits advanced on the Petition Date are even more tenuous than the "eleventh-hour bank account" that courts have heavily criticized.  *See In re Head*, 223 B.R. 648, 652 (Bankr. W.D.N.Y. 1998) ("To make the record clear, if these Debtors were to continue to assert eligibility by virtue of having acquired U.S. mailing addresses and opening small bank accounts in the U.S., then this Court would directly hold that one cannot so manufacture eligibility."); *In re McTague*, 198 B.R. 428, 432 (Bankr. W.D.N.Y. 1996) ("If property has been specifically placed or left in the United States for the sole purpose of creating eligibility that would not otherwise exist, then dismissal might be appropriate on other grounds, such as a bad faith filing . . . or under principles of abstention.").

42.     There is little doubt this is not a good faith filing, but instead an attempt to fabricate jurisdiction to take advantage of U.S. bankruptcy law and frustrate their creditors located on the other side of the world.  PARD's clear manufacturing of interests cannot be tolerated and must result in dismissal.

43.     The U.S. insolvency regime, as appealing as it may be, does not apply to all entities across the globe.  The mere fact that PARD is apparently displeased with both Singapore's and Bermuda's insolvency regimes, and fails to find another forum it likes, hardly satisfies the criteria set forth in Section 109(a) of the Bankruptcy Code.  Such blatant forum shopping should not be countenanced.

ii.      *PARD's Case Serves no Valid Bankruptcy Purpose*.

44.      The Second Circuit has consistently held that a naked desire to obtain the protections of the automatic stay is not a valid justification for seeking bankruptcy relief. *See In re HBA East, Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988) ("The protection of the automatic stay is not per se a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing.  A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one."

45.      In this case, PARD filed a bare-bones bankruptcy petition to stay the Bermuda Proceeding to stave off actions in Bermuda.  This is, in its most basic sense, forum shopping.  It is clear that PARD's sole purpose in seeking bankruptcy protection was to preempt the appointment of the Bermuda JPLs.  The goal of frustrating Maybanks' right to secure the appointment of JPLs in a previously initiated action hardly qualifies as a legitimate bankruptcy purpose.

46.      PARD's abusive tactics are underscored by the revealing facts that after (a) filing for bankruptcy, (b) notifying Maybank of the same, and (c) obtaining the desired result of staying the Bermuda Proceeding, no further action was taken, or relief requested, by PARD for nine days.  Such inexcusable delay removes any conceivable doubt concerning PARD's purpose in seeking to secure an unfair result by interfering with the Bermuda Proceeding.

47.      The basic purposes of Chapter 11 are (i) "preserving going concerns," and (ii) "maximizing property available to satisfy creditors." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453, (1999); *accord Toibb v. Radloff*, 501 U.S. 157, 163-64, (1991) (discussing "the congressional purpose of deriving as much value as possible from the debtor's estate").  Accordingly, to establish a valid bankruptcy purpose, PARD must

20

show that this Chapter 11 case will maximize the value of its estate.  *Id.*  PARD has failed to include any statement or representation to that effect.

48.     In particular, PARD fails to explain how either of the twin goals of Chapter 11 protection—"preserving going concerns" and "maximizing property available to creditors"—is to be promoted in this proceeding.  As noted above, PARD and the PARD Group are no longer operating.  Maximizing assets for creditors would involve the investigations and recovery actions that PARD has proven unwilling to pursue.  The assertions that this bankruptcy action was precipitated by (a) the finding in the Singapore Proceeding that the Singapore Court did not have jurisdiction to issue a global moratorium and (b) PARD's dislike for the Bermuda Proceeding and JPL process, compel the conclusion that this Case was initiated solely for the inappropriate purpose of precluding Bermuda from overseeing and adjudicating PARD's insolvency.

49.     Despite having many opportunities, PARD and the PARD Group have not been able to provide any cogent material to show that they have a realistic prospect of implementing a debt restructuring plan that will be in the best interests of their stakeholders.  What is most pressing at this time is that PARD's assets and the value of its estate be preserved for the benefit of creditors.  Provisional liquidators in Bermuda (as anticipated under the Bermuda Proceeding) are well-suited for this task and would be positioned to preserve the books and records of the PARD Group for the purposes of conducting an independent forensic examination of past transactions and other investigations to maximize recovery for PARD's creditors.

50.     Accordingly, this Chapter 11 case was commenced in bad faith under governing Second Circuit precedent, and must be dismissed under Section 1112(b)(1) of the Bankruptcy Code.

### iii. *This Proceeding Was Commenced to Obtain a Tactical Litigation Advantage in a Previously Pending Action.*

51.    Given the absence of a valid bankruptcy purpose for this Chapter 11 case, the highly suspect timing of the filing of the petition, and the advantages secured by PARD in avoiding the appointment of JPLs in the Bermuda Proceeding, the only reasonable conclusion is that PARD filed its petition as a litigation tactic to frustrate Maybank's exercise of its remedies in the relevant jurisdiction.

52.    It is well-settled that a Chapter 11 case is subject to dismissal if it was commenced primarily to obtain a tactical litigation advantage. *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1310. The benefits derived by PARD in commencing this Case are obvious. PARD's bare-bones Chapter 11 petition automatically stayed the entirety of the Bermuda Proceeding precisely because of PARD's paramount desire to preclude Maybank and its other creditors from exercising their rights.

53.    Dismissal, as opposed to conversion or the appointment of a trustee or examiner, is in the best interests of creditors and the estate. Individual and smaller unsecured creditors of PARD are unlikely to be able to participate in U.S. proceedings because the costs associated therewith likely outweigh the benefits. Accordingly, the appropriate course of action is to dismiss this Case and allow creditors, including Maybank, to continue pursuing their rights and remedies under applicable laws in relevant jurisdictions.

### B.    This Court Should Dismiss the Case Pursuant to Section 305(a) of the Bankruptcy Code.

54.    Alternatively, the Court should abstain from exercising its jurisdiction over this Chapter 11 case and dismiss it pursuant to Section 305(a)(1) of the Bankruptcy Code. Section 305(a)(1) empowers bankruptcy courts to dismiss an otherwise proper bankruptcy case at any

time if "the interests of creditors and the debtor would be better served by such dismissal." *See*

11 U .S.C. § 305(a)(1).  Pursuant to Section 305(c) of the Bankruptcy Code, the decision to

dismiss a bankruptcy case under Section 305(a)(1) of the Bankruptcy Code is left to the

discretion of the bankruptcy judge and is not reviewable by the respective court of appeals or the

United States Supreme Court, although it is reviewable on appeal by the respective district court

(or a bankruptcy appellate panel, where applicable) under an "abuse of discretion" standard. *See*

11 U.S.C. § 305(c); *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 463 (Bankr. S.D.N.Y. 2008).

55.     Although abstention under Section 305(a)(1) of the Bankruptcy Code is generally

considered "an extraordinary remedy," *Monitor Single Lift I,* 381 B.R. at 462, the circumstances

presented by this case fall squarely within the type of case warranting dismissal under Section

305(a)(1) of the Bankruptcy Code.

56.     Suspension or dismissal is warranted under Section 305(a)(1) of the Bankruptcy

Code when the debtor has limited or no contacts with the U.S. and the reorganization most

properly belongs in the jurisdiction of a foreign court.  E.g., *In re Cenargo Int'l, PLC*, 294 B.R.

571 (Bankr. S.D.N.Y. 2003); *In re Spanish Cay Co.*, 161 B.R. 715 (Bankr. S.D. Fla. 1993).  In

*Cenargo*, Judge Drain suspended and then dismissed the Chapter 11 cases of a group of UK-

based shipping companies that had limited connections to the U.S.  The debtors' main offices

were located in England, the parent company and most of its subsidiaries were organized under

English law, and the debtors conducted the entirety of their operations in foreign waters.

Although like PARD which similarly has limited connections with the U.S., the *Cenargo* debtors

actually had $175 million in high yield notes that were governed by U.S. law and held almost

exclusively by U.S. noteholders.  Such connections are significantly more substantial than in the

instant case.  The *Cenargo* court suspended, and ultimately dismissed, the chapter 11 cases,

recognizing that England had a greater interest than the U.S. in the companies' reorganization, with creditors that preferred the case to be administered in England, and thus, *was the proper forum*.

57.     Similarly, in *Spanish Cay*, the U.S. bankruptcy court first granted relief from the automatic stay to permit creditors of a debtor whose principal asset was real property in the Bahamas, to commence a Bahamian liquidation proceeding against the debtor.   Once that proceeding had been commenced, the U.S. bankruptcy court then dismissed the debtor's chapter 11 case pursuant to Section 305 of the Bankruptcy Code, finding that "the courts of the Bahamas have the greatest interest in liquidating the assets of the Debtor." *Spanish Cay*, 161 B.R. at 725.

58.     PARD has even fewer contacts with the U.S. than as was the case in both *Cenargo* and *Spanish Cay*.   Importantly, the U.S. has no articulable interest in maintaining this Case.   There are no U.S. jobs to be preserved.   There is no U.S. public debt or equity to be restructured.   It is abundantly clear that the U.S. is not a proper forum.   Indeed, it is apparent that neither PARD nor any other creditors of PARD bargained for their rights to be governed by U.S. laws and such a result flies in the face of the legitimate commercial expectations of the parties. *See id.* ("In this case both the Debtor and its creditors reasonably expected that Bahamian insolvency law would govern. In loan documents between the Debtor and [creditor], the parties specifically contracted for Bahamian law to apply."); *see also Maxwell Commc'n Corp. v. Societe Generale* (*In re Maxwell Commc'n Corp.*), 93 F.3d 1036, 1040, 1051 (2d Cir. 1996) (affirming dismissal of debtor's complaints and "deferring to the courts and laws of England" where "England ha[d] the strongest connection" to the litigation insofar as debtor and most creditors were British and the debt was incurred in England).   In fact, PARD acknowledges that

will be more difficult for its creditors to participate in its reorganization now that this Case has been commenced. *See* 10/10/16 Declaration at ¶ 58.

59.    For all of the foregoing reasons, the Court should dismiss this Case pursuant to Section 305(a)(1) of the Bankruptcy Code leaving PARD and its creditors to advance their respective rights and remedies under applicable law in the appropriate jurisdiction, consistent with their commercial expectations.

**C.    Dismissal of the Chapter 11 Case Should be With Prejudice Pursuant to Sections 105(a) and 349(a) of the Bankruptcy Code.**

60.    Pursuant to Section 105(a) of the Bankruptcy Code, the Court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, *or to prevent an abuse of process.*" 11 U.S.C. § 105(a) (emphasis added).  A bankruptcy court may apply its inherent powers under Sections 105(a) and 349(a) of the Bankruptcy Code[9] to dismiss a debtor's Chapter 11 case with prejudice and proscribe subsequent filings, where the debtor has commenced its bankruptcy case for an improper purpose and in bad faith.  See *Casse v. Key Bank Nat'l Assoc'n* (*In re Casse*), 198 F.3d 327, 336 (2d. Cir. 1999).

61.    PARD has wasted both legal and judicial resources by engaging in maneuvers to stymie and subvert a foreign judicial process.  In view of the entirely pretextual filing to stop the Bermuda Proceeding and Bermuda JPL appointment dead in its tracks, the Court should dismiss this Case with prejudice to prevent it from attempting to file another bankruptcy petition in this or some other jurisdiction to further impede a foreign jurisdiction.  PARD's bad faith filing

---

[9] Section 349(a) of the Bankruptcy Code provides:

> [u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title. . . .

11 U.S.C. § 349(a).

provides ample justification for the Court to proscribe it from seeking further relief under the Bankruptcy Code without first seeking leave of this Court.

**D.    Alternatively, Maybank Is Entitled To Relief From The Automatic Stay.**

62.    Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay. . . by terminating, annulling, modifying, or conditioning such stay – (1) for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1).

63.    "The burden of proof on a motion to lift or modify the automatic stay is a shifting one." *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990). Once the moving party makes an initial showing of "cause," the burden shifts to the defendant on all issues other than the debtor's equity in the property. *Id.*, 11 U.S.C. § 362(g).

64.    The facts that warrant dismissal in this Case also constitute "cause" for relief from the automatic stay for this purpose. *Spanish Cay*, 161 B.R. at 723-24 (granting relief from automatic stay to permit creditor to commence insolvency proceeding in the Bahamas, which had the greatest interest in liquidating the debtors).

65.    The "bad faith" analysis employed in considering the dismissal of a Chapter 11 case under Section 1112(b) of the Bankruptcy Code also applies in determining whether relief from the automatic stay is warranted. *In re 234-6 W. 22nd St. Corp.*, 214 B.R. at 757 ("in the context of a motion either to dismiss a chapter 11 case under § 1112(b) or to lift the stay under § 362(d)(1) the standards for bad faith as evidence of cause are not substantively different from each other"); *In re Kaplan Breslaw Ash, LLC,* 264 B.R. at 334 ("[W]hen faced with a motion to

lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that performed with a motion to dismiss a case on bad faith grounds.  In both cases, the relief sought is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis. But where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.") (quoting *In re 234-6 W. 22nd St. Corp.*, 214 B.R. at 757); *In re AMC Realty Corp.*, 270 B.R. 132, 141 (Bankr. S.D.N.Y. 2001); *Setzer v. Hot Productions, Inc. (In re Setzer)*, 47 B.R. 340, 344 (Bankr. E.D.N.Y. 1985) ("[b]ad faith has frequently been held to provide sufficient cause to warrant both types of relief").

66.    "Cause" to lift the automatic stay to permit Maybank to continue with the Bermuda Proceeding and its rights under the Singapore Proceeding, or otherwise exercise its legal rights and remedies with respect to PARD, is also present under the bad faith analysis under 362(d)(1) adopted by the courts.

## V.    NOTICE

67.    Notice of this Motion will be provided to (a) the Office of the United States Trustee for the Southern District of New York, (b) proposed counsel to PARD, and (c) any party requesting notice under Bankruptcy Rule 2002.

*     *     *

## VI.   **CONCLUSION**

WHEREFORE, Maybank respectfully requests that the Court enter an Order (a) dismissing PARD's Chapter 11 Case pursuant to Section 1112(b)(1) and/or Section 305(a) of the Bankruptcy Code, with prejudice, or, alternatively, (b) lifting the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code and (c) granting such other and further relief as may be just and necessary under the circumstances, to allow Maybank to proceed with the winding-up petition previously filed in the Bermuda Proceeding and pursue the appointment of the Bermuda JPLs thereunder.

Dated:  October 25, 2016
         New York, New York

**MAYER BROWN LLP**

By:    /s/ Frederick D. Hyman
       Frederick D. Hyman (FH7832)
       Christine A. Walsh (CW9533)
       MAYER BROWN LLP
       1221 Avenue of the Americas
       New York, New York 10020
       Telephone No.:  212 506-2500
       Facsimile No.:  212 262-1910

       *Attorneys for Malayan Banking Berhad,*
       *Hong Kong Branch*

28